## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| N.B., an individual,<br><br>                     Plaintiff,<br><br>    v.<br><br>RED ROOF INNS, INC. AND RED ROOF<br>FRANCHISING, LLC,<br><br>                    Defendants. | Case No. 22-cv-3771<br><br>**JUDGE** _____<br>Related Cases: No. 19-cv-849<br>               No. 21-cv-4933<br>               No. 21-cv-4934<br>               No. 21-cv-4935<br>               No. 21-cv-5022<br>               No. 22-cv-1924<br>               No. 22-cv-2682<br>               No. 22-cv-2683<br>               No. 22-cv-2690<br>               No. 22-cv-2734<br>               No. 22-cv-3185<br>               No. 22-cv-3202<br>               No. 22-cv-3203<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

COMES NOW, the Plaintiff N.B. ("Plaintiff" or "N.B."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1.      Plaintiff N.B. is a survivor of human sex trafficking.

2.      N.B.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.      N.B. was groomed into trafficking. Ultimately, her trafficker came to control every aspect of her life. The defining factor of the relationship between N.B. and her trafficker was that each night N.B.'s trafficker forced her to have sex with men for money.

4.     N.B. was trafficked at Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC (collectively, "Red Roof"). N.B. and her trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5.     At Red Roof's hotel, N.B. was forced to engage in sex with many men every day. Every new customer was another instance N.B. was forced to have sex against her will—that is to say, N.B. was raped multiple times per day by multiple men when she stayed at Red Roof's hotel.

6.     N.B.'s trafficker forced her onto Red Roof's property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7.     At some point, N.B. was able to escape the grasps of her trafficker and the prison of Red Roof's hotel rooms.

8.     N.B. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9.     N.B. brings this lawsuit in an attempt to hold Red Roof accountable for imprisoning her and benefitting from participating in a venture furthering her trafficking.

## OVERVIEW OF TRAFFICKING

10.     A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from the trafficking occurring on their properties.

2

12.     Red Roof knew and should have known for decades that sex trafficking repeatedly occurs under its brand flags.

13.     Rather than taking timely and effective measures to stop profiting from this epidemic, Red Roof chose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and provided Wi-Fi for this explicit and apparent purpose.

14.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[1] However, traffickers aren't the only profiteers. The hotel industry, including Red Roof, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Red Roof and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15.     The hotel industry ignored human trafficking on their premises, thereby enabling human trafficking in the United States to flourish.

16.     Red Roof and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at Red Roof's own properties worldwide. Red Roof and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by the Polaris Project, among others, created for the use of the hospitality industry.

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

17.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Red Roof and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Red Roof and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

18.     Red Roof's decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of N.B. on their properties.

19.     N.B., a survivor of sex trafficking, brings this action for damages against Red Roof pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. Red Roof knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

## PARTIES

20.     Plaintiff N.B. is a natural person and a resident and citizen of Hopkinsville, Kentucky.

21.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    a.     Due to the sensitive and intimate nature of the issues, Plaintiff N.B. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Red Roof maintains the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[2]

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the

b.     Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[5]

c.     Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.     Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

e.     Moreover, Red Roof will not be prejudiced. Plaintiff will agree to reveal her identity to Red Roof for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply

---

party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[5] Fed. R. Civ. P. 26(c).

[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Red Roof will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

22.     **Defendant Red Roof Inns, Inc. ("RRI")** is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through **Defendant Red Roof Franchising, LLC ("RRF")**.[7] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

23.     RRI is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

24.     RRI maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, Ohio 43221.

25.     RRF was named one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

26.     RRF maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, Ohio 43221.

---

[7] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

27. Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn & Suites located at 3053 US Hwy 41, Terre Haute, IN 47802 ("Terre Haute RRI").

  a. The Terre Haute RRI by Red Roof is a Red Roof branded property.[8]

  b. Red Roof employees work throughout the Terre Haute RRI by Red Roof. Red Roof employees work jobs including front desk and housekeeping. Red Roof is the principal with control over nearly every element of operations at the Terre Haute RRI by Red Roof. Red Roof is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Terre Haute RRI by Red Roof where N.B. was trafficked.[9] Red Roof has an actual and apparent agency relationship with the physical property owner of the Terre Haute RRI by Red Roof as to establish vicarious liability.

  c. Red Roof controlled and dictated the actions and inactions of the Terre Haute RRI by Red Roof through highly specific and detailed brand standards, policies, and procedures.

  d. Red Roof knowingly benefited, or received something of value, from its commercial business ventures at the Terre Haute RRI through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where N.B. was trafficked, as well as in maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal

---

[8] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).
[9] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue- management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").

data from the Wi-Fi it provided to customers including N.B. and her trafficker.

e.  Red Roof is subject to the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Red Roof regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Red Roof has derived substantial revenue from services rendered in Ohio.

f.  Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

## JURISDICTION AND VENUE

28.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

29.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC have their principal place of business within this District.

30.  Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:2021-cv-04935, 2:2019-cv-00849, 2:2021-cv-04933, 2:2021-cv-04934, 2:2022-cv-01924, 2:2021-cv-05022, 2:2022-cv-02682, 2:2022-cv-03185; and 2:2022-cv-02683 currently pending before Chief Judge Algenon L. Marbley.

## FACTUAL BACKGROUND

## INTRODUCTION

31.     N.B. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

32.     The TVPRA prohibits Red Roof from engaging in any venture they knew or should have known involves violations of 18 U.S.C. § 1591, and thereby establishes a non-delegable duty of reasonable care.

33.     An overwhelming majority of commercial sex trafficking transactions occur within hotels and motels, as traffickers use their rooms as the hub for their operations.[10] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Red Roof's Wi-Fi to advertise and solicit victims for commercial sex against their will.

34.     As part of its conspiracy, to save costs and continually reap millions of dollars in profits, Red Roof generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties. Furthermore, Red Roof did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

35.     Red Roof kept no reports or data on suspected incidents or occurrences of human trafficking on its properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Red Roof did not establish mandatory and secure reporting mechanisms at the point of sale.

---

[10] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

9

36.     With little to no risk posed to traffickers seeking to use Red Roof's rooms as a location to force victims like N.B. to engage in commercial sex against her will, the sex trade continues to thrive at Red Roof's branded properties while Red Roof reaps the benefits.

37.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

38.     Red Roof is jointly and severally liable for the Plaintiff's damages in this case.

**THE SEX TRAFFICKING OF PLAINTIFF N.B.**

39.     N.B. first met her trafficker when she was twenty-four (24) years old.

40.     By means of a combination of force, coercion, violence, threats, manipulation, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, N.B. was held captive and sold for sex by her trafficker.

41.     While under the coercive control of her trafficker, N.B. was imprisoned in the hotel rooms rented by her trafficker and forced to have sex for money. From approximately summer of 2016 to February 2017, N.B. was trafficked at the Terre Haute RRI by Red Roof located at 3053 US Hwy 41, Terre Haute, IN 47802.

42.     During the time she was trafficked, N.B.'s trafficker frequently rented rooms at the Terre Haute RRI by Red Roof because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with N.B.

43.     Throughout her trafficking, N.B.'s trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage and Craigslist advertising for N.B.'s availability for commercial sex, while connected to the Terre Haute RRI by Red Roof's Wi-Fi.

44.     N.B. was forced to have sex with multiple "johns" every day she was trafficked in Red Roof's hotels. N.B.'s trafficker forced her to have sex with these "johns" until the trafficker was satisfied with the amount of money, she made them.

45.     While at the Terre Haute RRI, N.B.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

46.     During her captivity at Red Roof's hotel, N.B. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned in at the Terre Haute RRI by Red Roof.

47.     At the Terre Haute RRI by Red Roof, N.B. encountered the same staff on multiple occasions. Red Roof's staff would have seen the signs of N.B.'s deterioration brought on by the abuse perpetrated by her trafficker, including bruising and physical and verbal abuse occurring in public areas of the hotel.

48.     During one stay at the Terre Haute RRI by Red Roof, N.B. was being brutally beaten by her trafficker and ran away. The staff allowed N.B., who was panicked, scared, and bruised and bleeding from the beatings, hide behind the front desk while her trafficker was chasing her and trying to attack her. The Terre Haute RRI by Red Roof staff told N.B. to "wait it out" for her trafficker to calm down. The staff did nothing to help N.B. and did not involve law enforcement.

49.     N.B.'s trafficker was extremely violent with her during their many stays at the Terre Haute RRI by Red Roof. Loud sounds of abuse and N.B.'s screams for help would have been obvious to staff and other guests.

50.     At the Terre Haute RRI by Red Roof there was constant foot traffic and loud yelling coming from the room. At all hours of the day and the night, the staff witnessed N.B. and the johns come into the main entrance and to N.B.'s room. After hours, N.B. or her trafficker would meet "johns" at the door and escort them to N.B.'s room. The constant stream of "johns"

in and out of N.B.'s room was captured by security cameras placed in the front lobby and by the elevators.

51.     Further, with each stay at the Terre Haute RRI by Red Roof, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting rooms away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Large number of male visitors asking for N.B. or her trafficker at the front desk; Physical abuse in public spaces; Visible signs of prior and private physical abuse; Unusually large number of male visitors coming in and out of the room; Women wearing clothing inappropriate for the weather; and Loud noises of abuse or other emergency audible to staff or other rooms.

52.     Plaintiff was repeatedly raped and otherwise sexually abused thousands of times at the Terre Haute RRI by Red Roof.

53.     These red flags were open and obvious to anyone working at the Terre Haute RRI by Red Roof and lasted consistently for months.

## RED ROOF'S KNOWLEDGE OF SEX TRAFFICKING AT ITS LOCATIONS

54.     Red Roof is aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[11] The United Nations,[12] international non-profits,[13] and the U.S. Department of Homeland Security,[14] have documented this well-known

---

[11] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017),
http://scholarship.sha.cornell.edu/honorstheses/3.

[12] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at
https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[13] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[14] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020),

epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Red Roof cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds its industry.

55.    For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for its hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

56.    Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[15] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[16] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

---

available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[15] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

[16] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

57.     Red Roof, on information and belief, has access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. Red Roof nevertheless does not share such information with other hotel locations, thereby preventing other hotel locations from acting to protect the victims of such suspected human traffickers.

58.     Red Roof also has access to public police reports, news reports, and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

59.     Red Roof has access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

60.     A brief examination of just a handful of examples suffices to show the extraordinary frequency with which Red Roof has long received and continues receiving evidence and reports that human trafficking runs rampant at its hotel locations:

      a.   Regarding a stay in January 2017 at an RRI located at 9520 Valparaiso Ct, Indianapolis, IN 46268, a hotel customer wrote a review saying, "Great room for prostitutes and John's. Completely disappointed could not believe how nasty the room was 1st the room smelled like mold and the comforters were stained badly the sheets had several blood stains on them needless to say we did not stay. We chose this location because all of the reviews and pictures seem to be quite good."

    b. Regarding a stay in 2020 at an RRI located at 2631 S Lynhurst Dr, Indianapolis, IN 46241, a hotel customer wrote a review saying, "No water on first 2 floors, staff was not helpful at all, and police were always there do to drugs & trafficking."

    c. In December 2016, two men were arrested for promoting prostitution at a Red Roof Inn in Lafayette, Indiana.[17]

## RED ROOF FACILITATED THE TRAFFICKING OF N.B.

61.    Red Roof is a signatory of the Code[18] and thereby has promised to adopt these policies to combat trafficking. Yet, Red Roof has failed to implement most, if not all of these policies, and continue to unlawfully benefit from the trafficking occurring on their properties.

62.    Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

63.    Red Roof profited from the sex trafficking of Plaintiff N.B. Red Roof rented rooms to and provided Wi-Fi to N.B.'s trafficker when they knew, or should have known, that human trafficking was prevalent within its branded properties and at the Terre Haute RRI by Red Roof where N.B. was trafficked. The hotel staff, especially front desk staff at Terre Haute RRI by Red Roof knew or should have known of the obvious signs of N.B.'s trafficking.

64.    Red Roof benefited from the steady stream of income that N.B.'s trafficker and "johns" bring to its hotel brands. Red Roof profited from each and every room that N.B.'s trafficker

---

[17] https://www.jconline.com/story/news/crime/2016/12/27/men-accused-promoting-prostitution-lafayette/95870334/
[18] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

and customers rented where N.B. was harbored and maintained for the purpose of sex trafficking. In addition, Red Roof profited from data collected each and every time N.B.'s trafficker and customers used Red Roof's Wi-Fi to advertise and solicit N.B. for commercial sex.

65.     Red Roof has made a public commitment to combat human trafficking, and thus, is aware that trafficking is a common problem in the hospitality industry. Red Roof should have been aware of the benefits they were receiving from the human trafficking occurring at the location where N.B. was trafficked given Red Roof had access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

66.     Moreover, Red Roof repeatedly collected data on N.B., her trafficker, and "johns" from her many stays at the Terre Haute RRI by Red Roof, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Red Roof's employees witnessed the obvious signs of N.B.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Red Roof failed to take reasonable measures to stop benefitting from sex trafficking from occurring in its hotels. If Red Roof would have taken proper measures, Red Roof would not have profited from N.B. and other victims like her being trafficked at their locations.

67.     Red Roof discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where N.B. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

68.     Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the Terre Haute RRI by Red Roof where N.B. was trafficked and reported this to Red Roof or would have if Red Roof did not fail to institute reasonable policies and procedures.

69.     In addition, Red Roof had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

70.     Red Roof failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on its properties. Red Roof maintained its deficiencies to maximize profits by:

    a.  Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

    b.  Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

    c.  Collecting and utilizing massive amounts of data from all of its branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in its hotels;

    d.   Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    e.   Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

    f.   Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

    g.   Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on its properties.

71.    As a direct and proximate result of these egregious practices on the part of Red Roof, N.B. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**<u>RED ROOF'S CONTROL OVER ITS BRAND HOTELS</u>**

72.    Upon information and belief, it is a standard practice in the hospitality industry, followed by Red Roof, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

73.    Red Roof provides their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned

on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

74.    Red Roof provides their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to its brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a substantial extent controlled by Red Roof.[19] Red Roof sees booking and reservation trends, including for the Terre Haute RRI by Red Roof where Plaintiff was trafficked.[20]

75.    Upon information and belief, Red Roof requires their branded hotel properties to use a property management system, which is linked to Red Roof's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

76.    Upon information and belief, per the relevant franchise agreements,[21] Red Roof may enforce their brand standards by means of periodic inspections of its brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

77.    Red Roof exercises day-to-day control over the Terre Haute RRI by Red Roof and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the Terre Haute RRI by Red Roof, as either direct subsidiaries or under the terms of its franchise agreements.

78.    Red Roof controls the operations of its branded properties through a variety of

---

[19] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[20] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.
[21] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

means enforced through franchise agreements and related contracts, including but not limited to:

    a.  Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

    b.  Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

    c.  Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

    d.  Providing and controlling customer review and response platforms;

    e.  Hosting online bookings on Red Roof's domain;

    f.  Requiring branded hotels to use Red Roof's customer rewards program;

    g.  Requiring branded hotels to use Red Roof's property management software;

    h.  Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

    i.  Providing IT support for all property management systems, owned, operated, and required by Red Roof;

    j.  setting employee wages;

    k.  sharing profits;

    l.  standardizing training methods for employees;

    m.  building and maintaining the facility in a manner specified by the owner;

    n.  standardized or strict rules of operation;

    o.  regular inspection of the facility and operation by owner; and

    p.  fixing prices.[22]

---

[22] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

79.     Red Roof manages corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[23]

80.     Red Roof controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Terre Haute RRI by Red Roof.[24] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[25]

81.     Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.[26]

82.     Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[27] Red Roof's privacy policy states that it collects information such as contact information, demographics,

---

[23] *See e.g., Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training. On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")

[24] *Id.*

[25] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")

[26] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9,

27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).

[27] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[28]

83.     Red Roof also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Terre Haute RRI by Red Roof.[29]

84.     In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Terre Haute RRI by Red Roof.[30]

85.     Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[31]

86.     Red Roof posts job openings for its branded properties on its central career positing website.[32] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[33]

## CAUSE OF ACTION

## COUNT 1: 18 U.S.C. § 1595 ("TVPRA")

---

[28] *Id.*
[29] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/
[30] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising. com/operational-support (last visited Jun. 6, 2022).
[31] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).
[32] *See* https://www.redroofjobs.com/
[33] *Id.*

87.     Plaintiff incorporates each foregoing allegation.

88.     Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

89.     Red Roof's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Red Roof had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Red Roof breached this duty through its participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

90.     Red Roof has benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Red Roof directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

91.     Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Red Roof's Terre Haute RRI.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

  a.   Awarding Plaintiff all available compensatory damages for each cause of action,

        including but not limited to past and future medical expenses; past and future lost

wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: October 23, 2022

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /
Jennifer.elkadi@babinlaws.com /
Kristina.aiad-toss@babinlaws.com